**In re Albert POLAK, Debra Vinson, Carol Ross, Janice Miller, Mary McElwain, Debtors/Appellants.**

Civ. A. Nos. G80–610, G80–611 and G80–630 to G80–632.

United States District Court, W. D. Michigan, S. D.

Feb. 27, 1981.

**504**

Chapter 13 Law Center by Murray B. DeGroot, Grand Rapids, Mich., for appellants.

### OPINION

FOX, Senior District Judge.

These matters, consolidated for appeal, present similar questions of law arising under chapter 13 of the Bankruptcy Act, 11 U.S.C. § 1301 et seq. The cases are all denials of chapter 13 plans entered by the Honorable David E. Nims, Jr. Jurisdiction is in this court under the transition period rules pursuant to 11 U.S.C. § 405(c)(1)(C), which provides that an appeal from a judgment, order, or decree of a United States bankruptcy judge shall be to the district court for the district in which the bankruptcy judge sits. The gravamen of the dispute is the interpretation and meaning of § 1325(a)(3) of the Bankruptcy Reform Act of 1978. That section states:

(a) The court shall confirm a plan if,

\*    \*    \*    \*    \*    \*

(3) the plan has been proposed in good faith and not by any means forbidden by law.

Appellants contend that where a plan proposes to pay more to the unsecured creditors than they would receive under chapter 7 liquidation, the plan is in "good faith" and the court must confirm it. Judge Nims, and a substantial share of bankruptcy courts, take the position that "good faith" means substantial or meaningful payments to the unsecured creditors, and unless these meaningful payments are part of the plan, the debtor cannot take advantage of the more liberal provisions of chapter 13.

*The Plans*

*In Re: Albert Polak*, G80–610 C.A.

The debtor lists $870 in monthly wages, and monthly expenses of $721. Under his petition, the debtor intends to pay $148 a month towards $600 in attorney fees and the $60 filing fee. He proposes to pay $3,404 on secured interests in his car, some jewelry and a mortgage arrearage. His total unsecured claims come to $3,021, of which he proposes to pay 100% on a claim of $97 from a N.S.F. check, and 10% on the remaining debt of $2,924. Debtor's plan would take 33.43 months to pay out. The bankruptcy court noted in its findings of fact that if the plan were continued to 36 months, he could pay a dividend to the non-preferred unsecured creditors of 21.71%. The bankruptcy court concluded that while the creditors would not receive a

cent in a chapter 7 proceeding, this plan was not filed in good faith.

*In Re: Debra Vinson*, G80–611 C.A.

Under this petition, the debtor lists $544 a month in income, $464 of which is from unemployment compensation benefits and $385 in monthly expenses. The debtor proposes to pay $73 biweekly towards the $660 in administrative expenses. Next, payments would be made on the 1978 Olds Cutlass and after such payments, the unsecured creditors would be paid 10% of their debt. This amount was raised to 15% at the confirmation hearing. The bankruptcy court concluded that after taking into consideration the past history of this debtor in failing to comply with the orders of the court in a previous chapter 13 case, the filing of a subsequent chapter 13 case in less than one month, and the disproportionate amount of payment to unsecured creditors as compared to payments to the attorney for the debtor and the secured creditors, the plan was not in good faith. Further, the court ruled that a plan based solely on unemployment compensation benefits could not be confirmed. Appellant seeks review of the good faith requirement of § 1325(a)(3), and the issue of whether a chapter 13 plan is feasible when it is to be funded by unemployment compensation benefits.

While this case poses interesting questions, and the bankruptcy practice may be anxious to have appellate decisions on these issues, this court is bound by the mootness doctrine not to render unnecessary opinions. Since the filing of the notice of appeal, an order was entered continuing the automatic stay during the pendency of the appeal, conditioned on the debtor making payments to the trustee. Debtor did not, in fact, make those payments, and the bankruptcy court entered an order dismissing the plan and terminating the automatic stay. Since it appears obvious that the debtor has no intention of continuing with the chapter 13 plan, this court must dismiss this case as being moot. Here, a decision by this court would not have any practical effect on an existing controversy, since no actual controversy exists. The heavy workload all courts bear denies us the luxury to engage in academic pursuits, no matter how enlightening or helpful those discussions may be for future litigation. As the court in *Matter of American Beef Packers, Inc.*, 457 F.Supp. 313, 316 (D.Neb.1978), stated:

> "Where circumstances so change during the pendency of an appeal that no effectual relief can be granted, the court will dismiss the appeal as moot." *Local Joint Executive Board, AFL–CIO v. Hotel Circle, Inc.*, 419 F.Supp. 778, 783 (S.D.Cal. 1976). This includes a bankruptcy appeal.

This is not one of those situations where the issues are "capable of repetition yet evading review," since the other appeals present substantially similar questions of law. Therefore, since the debtor has abandoned her chapter 13 proceeding, and her case has been dismissed by the bankruptcy judge, there is no longer a controversy, and accordingly this appeal is dismissed.

*In Re: Carol Ross*, G80–630 C.A.

This debtor is an employed mother of three, and has a monthly income of $992. Under her plan, she proposes to pay $42 per week. Payments would first be made toward the attorney fees of $600; next on the secured claims of $4,200, and finally 10% to the unsecured creditors on their claims of $4,165. The plan would last for 31 months. Confirmation was denied under the principles set forth in *In re Hurd*, 4 B.R. 551, 6 B.C.D. 412 (W.D.Mich.1980).

*In Re: Janice Miller*, G80–631 C.A.

This debtor is an unemployed, divorced mother of three on A.D.C. She receives $469 per month from A.D.C. and another $151 from a boarder and from blood donations for a total monthly income of $620. The debtor proposes to pay $25 bimonthly with payment to be made, first, on the administration expenses, including attorney fees of $600; next, to the secured creditor, a sum of $450 to pay off her automobile and furniture, and finally 10% on the unsecured claims. The plan would last for 27 weeks. The total amount to be paid, other than filing fee and fees and expenses to the trustee, would, run as follows:

| | | |
|---|---|---|
| Secured Creditors | $450 or | 38.6% |
| Unsecured Creditors | 113.8 or | 9.8% |
| Attorney Fees | 600 or | 51.6% |

Judge Nims held that since the bulk of the payments will be used to pay off her car and furniture, and her attorney fees, a 10% payment to the unsecured creditors is not in good faith in view of the principles set forth in *In re Hurd*, 4 B.R. 551, 6 B.C.D. 412 (W.D.Mich.1980).

*In Re: Mary McElwain*, G80–632 C.A.

A single woman who is employed under the C.E.T.A. program, this debtor's take home pay is $585 a month, and she receives monthly rental income of $213. Under her plan, she proposes to pay $50 biweekly. First payments would be on the administration expenses, including $450 in attorney fees. The secured claims totaling $2,430 would be paid in full, and $270 would be paid to the unsecured creditors, that sum representing 10% of the amount due. The bankruptcy court held that this plan was not filed in good faith under the principles set forth in *In re Hurd, surpa*, and the case was dismissed.

*Section 1325(a)*

■ Section 1325(a) provides:

(a) the court shall confirm a plan if—

(1) the plan complies with the provisions of this chapter and with other applicable provisions of this title;

(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of. each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

The Code and its legislative history are clear that if the six requirements are met, the court is required to confirm. (H.Rept. No.95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977) p. 430, U.S.Code Cong. & Admin.News 1978, 5963; S.Rept. No.95–989 to accompany S. 2266, 95th Cong., 2d Sess. (1978), p. 142, U.S.Code Cong. & Admin.News 1978, 5787; 5 Collier on Bankruptcy ¶ 1325.01 (15th Ed. 1980).

The "good faith" language of Section 1325(a)(3) has produced two distinct lines of judicial decisions. One line of cases holds that Section 1325(a)(4) is the only section dealing with the number of dollars which a plan must offer to creditors. Under this view, as long as the unsecured creditors receive not less than they would in a straight liquidation case, the dollar distribution requirement has been met, and no "substantial" payment need be made to unsecured creditors. This is the theory appellants argue is the correct interpretation. It is argued that the lack of an offer of a substantial or meaningful payment to the unsecured creditors has nothing to do with whether a chapter 13 plan has been proposed in good faith. The other line of decisions holds that a plan which offers unsecured creditors something less than substantial or meaningful payments is not proposed in good faith. Implicit in these opinions is the feeling that a debtor must deal honestly with his creditors, and has to pay a price for the benefits of a chapter 13 discharge.

In trying to determine what is "good faith," the bankruptcy courts have faced a

perplexing task. Section 1325(a)(3) is derived from Bankruptcy Act § 651. Unfortunately, there is no reported case law construing the good-faith requirement under Bankruptcy Act § 651, nor does the legislative history of section 1325(a)(3) reveal its rationale. 5 Collier on Bankruptcy ¶ 1325.-01[C] (15th Ed. 1980). Therefore, as so many bankruptcy courts have been forced to do, this court must sift through the history, purpose and spirit of chapter 13.

*History of Chapter 13*

In 1938, Chapter XIII, a "Wage Earners' Plan," was added to the Bankruptcy Act. In general this chapter provided a mechanism whereby a wage earner could pay a portion of his wages to a trustee who in turn would distribute these payments to the debtor's creditors according to a plan submitted by the debtor, accepted by the creditors and confirmed by the court. See, *In Re Hurd, supra.* The purpose of Chapter XIII was to provide an alternate method of debtor relief. However, it has frequently been noted that more than just mere relief from debt was considered.

> It is intended to assist the rehabilitation of the debtor in mind as well as in finances by providing a practical method for the working man to keep his job, maintain his family, and pay his debts .... Under a wage earner extension plan, the debtor seeks to pay his debts not to discharge them, and the declared congressional intent with regard to Chapter XIII is that in that effort he should be encouraged.

9 Am.Jur.2d Bankruptcy § 1383 (1963). Not only would a debtor be able to protect himself against the vexatious practices of bill collectors and keep his assets intact, the debtor was able to avoid the psychological stigma sometimes attached to being declared or adjudged a bankrupt, and could ultimately be in a much more advantageous position than if he had gone through straight bankruptcy. 10 Collier on Bankruptcy ¶ 20.01 (14th Ed. 1978).

The availability of relief under chapter XIII was quite narrowly drawn. Originally "wage earners" were limited to individuals having wages or salary not exceeding $1,500 a year. This amount was later raised to $3,600 per year, and to $5,000 by the 1950 amendments. Finally, by the Amendment of 1959, the monetary restriction was removed, and all persons employed for wages, salaries or commissions could use chapter XIII to erase their debts through installment payments instead of being adjudicated bankrupt. 10 Collier on Bankruptcy ¶ 22.09 (14th Ed. 1978).

After the debtor filed his plan, there had to be acceptance of it by all creditors affected thereby. If a wage earner's plan had been accepted by all creditors affected, the plan was confirmed by the court when the debtor made the required deposit, and the court was satisfied that the plan and its acceptance were in good faith and had not been made or procured by any means prohibited by the Bankruptcy Act. 9 Am. Jur.2d § 1388 (1963). Specifically, after the required acceptances were obtained, Section 656 provided:

> (a) the court shall confirm a plan if satisfied that,
>
> (1) the provisions of this chapter have been complied with;
>
> (2) it is for the best interests of the creditors and is feasible;
>
> (3) the debtor has not been guilty of any of the acts or failed to perform any of the duties which would be a bar to the discharge of a bankrupt; and
>
> (4) the proposal and its acceptance are in good faith and have not been made or procured by any means, promises, or acts forbidden by this Act.

Unfortunately, good faith was not defined in the Act. However, in trying to understand the term it is generally thought that the inquiry should be "directed to whether or not there has been an abuse of the provisions, purpose, or spirit of chapter XIII in the proposal or plan." 10 Collier on Bankruptcy ¶ 29.06[6] (14th Ed. 1978). *See also*: Similar standard and definition used under § 366 of chapter XI in 9 Collier on Bankruptcy ¶ 9.20 (14th Ed. 1978); 4 Collier on Bankruptcy ¶ 67.41[4] (14th Ed. 1978), where in discussing § 67d(6) of the old act

dealing with the validity of fraudulent transfers against the trustee, it was stated, "Good faith has been variously described. The unpredictable circumstances in which its presence or absence may be found render any definition inadequate if not unwise."

While chapter XIII provided a better vehicle for debtor relief than previous acts, it was deficient in a number of important areas. Some of its major weaknesses were that:

Chapter XIII was limited to individuals whose principal income came from wages, salary, or commissions, thus excluding self-employed individuals, such as farmers, entrepreneurs, and other individuals incurring trade credit in the production of income. Chapter XIII did not authorize a joint petition by a husband and wife, requiring instead that each spouse qualify as a "wage earner" in order to be eligible for relief. Composition plans under Chapter XIII were discouraged by the requirement that unsecured creditors accept the plan and by the imposition of a bar to further discharge relief within six years of the date of the confirmation of a Chapter XIII composition plan. The role of the Chapter XIII trustee under Chapter XIII was ambiguous, with some claiming that the Chapter XIII trustee was a mere disbursing agent and others insisting upon a much broader trustee role. Discharge relief for debtors unable to complete payments under the plan due to circumstances for which they could not be accountable was withheld arbitrarily until a minimum of three years after the confirmation of the plan. The duration of plans was left entirely unrestricted, with the result that virtually all Chapter XIII plans proposed payment of all debts in full, through the simple device of lengthening the extension period of the plan, regardless of the ability of the debtor to pay.

5 Collier on Bankruptcy ¶ 1300.01 (15th Ed. 1980).

The Bankruptcy Reform Act of 1978, and particularly Chapter 13, attempted to address some of the serious shortcomings of its predecessor. In the Senate Report of the Bankruptcy Reform Act of 1978, it was stated that:

In theory, the basic purpose of Chapter XIII has been to permit an individual to pay his debts and avoid bankruptcy by making periodic payments to a trustee under bankruptcy court protection, with the trustee fairly distributing the funds deposited to creditors until all debts have been paid. The hearings record and the bankruptcy literature show uniform support for this principle.

(S.Rept.No.95–989 to accompany S. 2266, 95th Cong., 2d Sess. (1978) p. 12, U.S.Code Cong. & Admin.News 1978, 5798). The Senate envisioned that under the new chapter:

As in current law, 100 percent payments plans will be encouraged by limitation on availability of a subsequent discharge in section 727(a)(8). This kind of plan has provided great self-satisfaction and pride to those debtors who complete them, and at the same time effect a maximum return to creditors .... It is also necessary to prevent chapter 13 plans from turning into mere offers of composition plans under which payments would equal on the non-exempt assets of the debtor.

(Ibid. p. 13, U.S.Code Cong. & Admin.News, 5799).

The House committee report expressed grave concern over the great expansion in consumer credit. Inadequacies of the old act were pointed out, and the hope was expressed that under a new act, effective relief could be given that would allow consumers a fresh start, and avoid the weaknesses and near indentured servitude that resulted under the old act. The House Subcommittee found that:

[M]ost consumer debtors would rather work out a repayment plan than file straight bankruptcy. They opt for straight bankruptcy only because present chapter XIII simply cannot meet their needs. Only in certain areas of the country where the bankruptcy judges have taken an active interest, have put in the

extra effort required to make chapter XIII work, and have encouraged the bar to recommend its use, has chapter XIII provided any substantial or realistic alternative to straight bankruptcy liquidation. House Rept. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977), p. 117, U.S.Code Cong. & Admin.News 1978, 6077. The report goes on:

> The purpose of chapter 13 is to enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his debts over an extended period. In some cases, the plan will call for full repayment. In others, it may offer creditors a percentage of their claims in full settlement
>
> . . . .
>
> . . . Chapter 13 also protects a debtor's credit standing far better than a straight bankruptcy, because he is viewed by the credit industry as a better risk. In addition, it satisfied many debtors' desire to avoid the stigma attached to straight bankruptcy and to retain the pride attendant on being able to meet one's obligations. The benefit to creditors is self-evident: their losses will be significantly less than if their debtors opt for straight bankruptcy.

Id. at 118, U.S.Code Cong. & Admin.News, 6079.

■ After examining the legislative history, it is clear that the purpose behind chapter XIII was twofold: to rehabilitate the debtor in mind, as well as in finances, by providing a mechanism for the worker to pay off his debts. More than just a cancellation of debt was intended. This chapter provided a debtor with protection from bill collectors, a chance to avoid the psychological stigma attached to "going bankrupt," and provided the debtor with a more advantageous position than if he had gone through straight bankruptcy. However, to participate under this chapter, the debtor had to meet stringent financial qualifications, and his plan had to gain approval of all creditors affected. Despite these restrictions, the literature suggests that many consumers wanted to pay off their obligations, and the Act encouraged the use of full payment plans.

■ The Reform Act of 1978 attempted to address most of the serious shortcomings of Chapter XIII. Appellants argue that, as a consequence of these changes, § 1325(a)(4) is the only section that concerns the amount the unsecured creditors receive. It is urged that as long as the creditors obtain not less than the amount they would be paid under chapter 7, the plan must be confirmed. This court, after thoroughly examining the legislative history behind the Act, disagrees. While chapter 13 is much more flexible and provides the debtor with increased protections, there is nothing in the committee reports suggesting Congress turned away from one of its primary objectives in chapter XIII, that is, encouraging a debtor to *repay* his debts. Chapter 13 is premised on the belief that consumers would rather repay their obligations. Both committee reports suggest that 100% payment plans are still to be encouraged. Section 1325(a)(4) does not establish the maximum a debtor must pay, but rather is a minimum standard. The plan, in addition to § 1325(a)(4), must be proposed in good faith. As the court in *In re Cook*, 3 B.R. 480, 485–6, 6 B.C.D. 219, 222 (S.D.W.Va.1980), explained, the "process progresses toward answering the question 'how much can I pay?' rather than starting out trying to determine 'how little can I get by with paying?' "

Appellants contend that any requirement of a "meaningful payment" is too subjective of a standard, and is a sort of judicial tinkering that Congress sought to avoid. However, it was just this flexibility that Congress wanted to instill in the new law. The House Committee found that:

> Only in certain areas of the country where the bankruptcy judges have taken an active interest, have put in the extra effort required to make Chapter XIII work, and have encouraged the bar to recommend its use, has chapter XIII provided any substantial or realistic alternative to straight bankruptcy liquidation.

Id. at 117. It is illogical to conclude that Congress, after praising the efforts of ac-

tive bankruptcy judges, would proceed to strip them of all discretion without some comment.

In *In re Terry*, 630 F.2d 634, 6 B.C.D. 974, 975 (8th Cir. 1980), a case where the chapter 13 plan proposed zero payment, the Eighth Circuit stated:

> The bankruptcy judge reasoned that a requirement of payments for "good faith" would create difficulties because such a requirement would necessitate a determination in every case of whether the proposed payments were sufficient for "good faith." We agree that a payment required would create some difficulties, because of the absence of any statutory guidelines as to the minimum necessary percentage payment.

However, those difficulties are what a judge has to confront. Good faith, as was seen earlier, is a standard that is hard to define, and its presence or absence can at times be almost unpredictable. When Congress imposes a standard like this, they necessarily invoke the expertise of the factfinder to weigh all the facts and circumstances to determine if a particular case fits within the purpose and spirit of the legislative act. District courts have to face situations every day where there are no set statutory guidelines or checklists to follow. Oftentimes, only vague constitutional principles are all there are to follow. There is nothing defective about a bankruptcy statute that requires a bankruptcy judge to use his knowledge and expertise to weigh a plan and see if it is proposed in good faith. Such is the essence of judicial decision making.

■ Proceeding on a case-by-case method is precisely the type of review Congress wanted bankruptcy courts to follow. Chapter XIII was roundly criticized for being too restrictive, too mechanical. A debtor either obtained approval of his plan from all creditors affected, or he did not proceed with Chapter XIII relief. The reforms eliminated the need for creditor approval, but did not change the basic purpose of Chapter XIII. The debtor must still deal fairly and honestly with his creditors if he elects to proceed under the Chapter. Instead of the creditors holding the debtor's fate in their hands, the court now allows the debtor a fresh start and rehabilitation, if his plan is permeated with good faith. The court in *In re Schongalla*, 4 B.R. 360, 362, 6 B.C.D. 408, 409 (D.Md.1980), was correct when it stated:

> [T]he good faith requirement of Section 1325(a)(3) should be interpreted as meaning that such plans cannot be confirmed without an inquiry into all of the circumstances involved in each individual case.

Reflecting what this court believes was the intent and effect of Congress passing Chapter 13, the court in *In re Cook*, 3 B.R. at 485, 6 B.C.D. at 222, explained:

> While indulging "great flexibility" to the debtor and stripping creditors of their veto power over the plan, Congress did not leave the debtor bridled only by his imagination. Id.

> The "good faith" provision is the scale on which the debtor's handiwork must ultimately be weighed. If he meets the specific statutory requirements and then uses the flexibility allowed him in what amounts to good faith, the broader discharge and the opportunity for successive use of the Chapter will not result in abuse of either creditors or the system.

In *In re Hurd*, 4 B.R. 551, 558, 6 B.C.D. 412, 417 (W.D.Mich.1980), Judge Nims reached a similar conclusion when he held that:

> Considering the history of bankruptcy, the legislative history of the 1978 Code, and the Code as a whole, I am satisfied that Congress intended by the requirement of "good faith," to rely upon the common sense and the perception of justice and equity in the federal courts to assure fair administration of the new Chapter 13.

■ The bankruptcy courts have focused on many factors in attempting to analyze whether a Chapter 13 plan is proposed in good faith. Such analysis inevitably focuses on whether the debtor is proposing to make "meaningful payments" to his creditors. Bankruptcy courts should not require a certain minimum percentage before pay-

ments can be considered "meaningful," but should employ a multifactor test to determine whether a particular debtor is making a good effort to deal justly and fairly with his creditors.

In requiring a debtor to make meaningful payments, the first place the courts have focused, and should focus their attention, is on the percentage the unsecured creditors will receive. The amount required by the courts has varied anywhere from 70% to 1 or 2% plans. The lower the percentage, the less likely courts are to find good faith. While many other factors are taken into consideration, the courts that follow the "substantial payments" theory rarely proceed to other factors if the percentage is very low. The percentage of payments should not become, however, a talisman or the sole divining rod with which a bankruptcy court seeks out the elusive good faith requirement.

While percentage of payments is the best and most easily determinable indicator of good faith, it is not the only one. The amount of payments is a critical factor. If the debtor is paying as much as he can afford to, then good faith is more likely present. Directly related to the question of the amount of payments is the length of the plan. If a plan is scheduled to last for 36 months, or even beyond in extreme cases, and the debtor is paying all that he can, then good faith is almost a certainty. The analysis of these factors is appropriate and specially suited for the factfinder.

Other factors that the courts have found enlightening are whether the debtor has any prior petitions in bankruptcy courts, the extent and nature of the debts, the debtor's right to discharge under Chapter 7, the extent of preferential treatment between classes of creditors, the source and continued likelihood of future income, and the burdens placed upon the trustee. A bankruptcy court would be remiss if it did not analyze all the various factors that enter into good faith. This analysis must be made on a case-by-case basis, and each debtor's position should be reviewed from the totality of circumstances. While one factor may be accorded more weight than others and indicate a lack of good faith, there may be other factors in combination that compel a finding of good faith.

A final factor that should be considered, and one this court mentions most gingerly, is the relationship of attorney fees and administration expenses to the amount paid to unsecured creditors. While this court is not about to set fee schedules, it is apparent that some fees charged are greatly in excess not only of the amount paid to unsecured creditors, but in some instances they are in excess of what the secured creditors will be paid. When this is the situation, this court would find it difficult to explain to these creditors how the plan meets the good faith requirement. One of the great advantages of Chapter 13 relief is the ability to have attorney fees paid as part of the expense of the plan. However, this advantage should not overshadow the fact that the purpose of Chapter 13 is to pay one's creditors. The amount of attorney fees is dependent on many facts and circumstances peculiar to each debtor. The bankruptcy court, with years of experience in these matters, is best suited to determine whether a proposed fee is excessive.

In the present situations, it is apparent that Judge Nims gave careful consideration to many factors before denying confirmation of these plans. The factors he applied are consistent with the purpose of Chapter 13 relief. Judge Nims appears to be cognizant of the fact that many "poor" debtors will not be able to pay as great a percentage of their debts as debtors who have higher future income, and does not base his decisions on a straight minimum percentage requirement, but rather applies various factors on a case-by-case basis. Since the approach used by the bankruptcy court is consistent with the purpose and spirit of Chapter 13 relief, and does not unnecessarily restrict the ability of "poor" debtors to obtain the advantages of Chapter 13, this court affirms the decisions in these cases.