**In re Ronald F. BELKA and, Penny S. Belka, Debtors.**

**Bankruptcy No. NK–81–00711.**

United States Bankruptcy Court, W. D. Michigan.

Aug. 4, 1981.

Murry B. DeGroot, Grand Rapids, Mich., for debtors.

Donald W. Kreling, Trustee, in pro per.

## OPINION AND ORDER

DAVID E. NIMS, Jr., Bankruptcy Judge.

On February 13, 1981, Ronald F. Belka and Penny S. Belka (Belkas) filed a petition under Chapter 13 of Title 11 of the United States Code. At the first meeting the trustee indicated that he would not recommend confirmation of the proposed plan. At the hearing on confirmation, neither Belkas or their attorney appeared and confirmation was denied. No objection has been taken to this order, nor has an appeal been taken. Instead Belkas amended their plan to raise the proposed distribution to unsecured creditors from 10% to 12%.

The plan as filed and amended is confusing. It is clear from a stipulation between Belkas and G M A C that after payment of the filing fee, GMAC will be paid $45.00 per month and remaining payments will be made to the Belkas' attorney until the plan is paid in full. Neither the plan itself or the incorporated schedules indicate how payments are to be made. The plan provides for payment on unsecured claims "per capita" but there is no indication as to whether other claims are to be paid per capita or pro rated. Since the plan will not be confirmed as amended, the fact that the plan is incomprehensible is immaterial.

Debtor Ronald F. Belka has been employed by General Motors Corporation for 16 years. His salary for 1980 was $26,-100.00. According to their proposed plan, the Belkas' monthly income will be $1,599.00 and expenses $1,270. After deducting the proposed monthly payment of $320.00, this family of two adults and eight children between the ages of 4 and 13 will have a cushion of $9.00. Belkas are purchasing their home on a land contract. They purchased the house in 1978 for $45,-000. The present state equalized value on the home is $23,148.00, which would represent a value of $46,296.00. According to the claim filed by the land contract vendors, the amount due on the contract is $27,-735.23. At the time of filing, Belkas had income tax refunds due them in the amount of $2,300.00. These have been received and spent. Under the plan, Belkas propose to pay off the following debts:

| | |
|---|---:|
| Filing Fee | $ 60.00 |
| Attorney Fee | 700.00 |
| Priority Tax Claim | 1849.54 |
| Secured Claims: | |
|     GMAC--'79 Chevrolet<br>        3/4 ton pick-up,<br>        4 Wheel      $4,928.06 | |
|   GMAC  '79 Chevrolet<br>        Beauville Sportvan--$4,200.00 | |
|   Multi-Products Credit Union<br>        '72 Chevrolet Caprice Wagon<br>        '74 Allis Chalmers Tractor<br>      two 1977 Boat Ski 440<br>            Smowmoblies   5,832.63 | 14,960.69 |
| Unsecured Claims at 12% ($4,075.12) | 489.01 |

Not included in the above payments is the interest payment to secured Creditors. This will probably come to $12.68, APR, on the first GMAC claim; $12.83, APR, on the second GMAC claim, and 7% on the Multi Products Credit Union claim.

This plan cannot be confirmed for several reasons.

█ It is not in good faith as required by 11 U.S.C. § 1325(a)(3). In *In re Polak*, 9 B.R. 502 (U.S.Dist.Ct., W.D.Mich., 1981), the court indicated that the good faith test was intended by Congress to be a matter left to the Court's discretion, based on an evaluation of all the circumstances in an individual case. 9 B.R. at 510. Under the present plan over 82% of the payments will be to secured creditors without calculating additional amounts for interest. An additional 10% will be used to pay back taxes, again without considering additional interest payments. Unsecured creditors, on the other hand, will receive only 12% of the amount of their claims, and in a total amount for less than that to be paid in attorney fees. The Court in *Polak* further indicated that the Court should consider the debtor's ability to pay in assessing good faith. In light of this, both the trustee and I are troubled by the fact that the Belkas failed to incorporate into the plan tax refunds amount to $2,300.00 which would have paid unsecured creditors another 50.8% or a total of 62.87. In light of these factors, the Court finds that the plan has not been proposed in good faith, and may not be confirmed.

Furthermore, the plan cannot be confirmed because, in the opinion of the Court, the value of the distribution under the plan would be less than the amount paid under Chapter 7. 11 U.S.C. § 1325(a)(4). This objection was not raised by the trustee at the time of the original hearing as he accepted, as did the Court, the figure of $10,-860 for the value of property given on the debtors' forms. Attorneys for the debtor did not use the official forms. Official Form No. 13-5. In the form used, the description of real property set forth a market value of $45,000, total amount of debt secured by a lien of $29,640, and a net value of property in excess of liens of $10,860. Of course the difference between $45,000 and $29,640 is $15,360. Both the trustee and the Court had been misled. When asked for an explanation, the attorney who prepared the statement indicated that a straight 10% was deducted for the expensed of disposing of real estate and that it was the policy of the Clinic to deduct this amount in all cases when determining Exemptions. I cannot agree that in determining assets, the costs of administration are to be automatically deducted. While it is true that the Court will sometimes look to administrative expenses to determine whether creditors would be better off under Chapter 7 than Chapter 13. But this is only after all exemptions have been properly calculated. A trustee will seldom have to sell a house in a Chapter 7 case. The debtor will usually raise the amount of the equity over the exemptions and retain the house. The trustee will also canvas neighbors and relatives, incurring the expenses of a realtor's commission only as a last resort. I have found no case which allows the deduction of possible sale expenses from the value of the homestead in determining exemptions.

█ Thus, my analysis of the assets in the event of a Chapter 7 proceeding would be as follows:

| | |
|---|---|
| Value of homestead | $46,296.00 |
| Amount owed on Contract | 27,735.23 |
| | 18,560.77 |
| Exemption [(d)(1) & $800 under (d)(5)] | 15,800.00 |
| Available to estate | 2,760.77 |
| Other assets | 3,417.00 |
| Total to estate | $ 6,177.77 |

Thus, in my opinion unsecured creditors would do much better in a Chapter 7 proceeding.

 Finally, I cannot confirm this plan because I cannot find that these debtors can make all the payments under the plan as required by 1325(a)(6). In their budget, Belkas show a cushion of only $9.00 a month. While Mr. Belka may receive cost of living raises, these are intended only to offset the effects of inflation. Soon the older children will be reaching high school age with greater expenses for food, clothing, and medical care. Yet in their amended plan, Belkas indicate that, even before the plan, they did not have enough to eat. It has frequently been held that a plan should not be approved where the Court finds it is not feasible. For example in *In re Coleman*, 5 B.R. 812 (U.S.Dist.Ct., W.D. Ky., 1980) the District Judge reversed the confirmation of a plan where he found a $4.00 cushion too small. Similarly, in *In re Lucas*, 3 B.R. 252, 6 B.C.D. 82 (Bkrptcy., S.D.Cal., 1980), the Court held a cushion of $2.00 insufficient, the Court further indicated that medical expenses of $10.00 and clothing of $50.00 for a family with three children, the same amounts budgeted by Belkas, were unrealistic. See also *In re Washington*, 6 B.R. 226, 6 B.C.D. 1094 (Bkrptcy., C.D.Va., 1980) (cushion of $44.93 insufficient where no allowance for clothing, laundry, medical expenses); *In re Guerrieri*, 10 B.R. 464, 7 B.C.D. 584 (Bkrptcy., D.R.I., 1981) ("By putting their last pennies into the plan, the debtors have left nothing for contingencies with which we all face.")

*Separate record.* This case has been decided on the files and records. The Court accepted the debtors' schedules except where claims were filed and no objections were made as to the value of securities or amount of claim. The attorney representing the Belkas asked at the confirmation hearing to put his client on the stand in order to make a separate record. As the transcript of the hearing indicates, counsel then began to cross-examine the Court as has been his practice in every case where the Court has disagreed with him. Apparently his purpose is to so anger the Court by his discourteous and almost contemptuous attitude that the Court will be caught off guard and make a statement that can be used on appeal. This has been done in five of six cases which he has appealed. In this case he was successful in that the Court failed to allow counsel to make a separate record as he had a right to do. He has since announced that he will be taking an appeal in this case.

NOW, THEREFORE, IT IS ORDERED AS FOLLOWS:

1. Confirmation is denied.

2. This case is dismissed.

3. All further stay of proceedings are terminated.

4. A hearing for the sole purpose of the making of a separate record will be set for the first available time in Kalamazoo. Counsel for the debtors may obtain a date from the assignment clerk notifying her as to the amount of time required.